**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRITT JOY HAWKER; CRAIG DEE
HAWKER, as guardians for C.G.H., a
minor,

        Plaintiffs – Appellants,

v.

SANDY CITY CORPORATION;
OFFICER TINA MARIA ALBRAND,

        Defendants – Appellees.

No. 13-4139
(D.C. No.: 2:12-CV-00001-RJS)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

This case involves the arrest of C.G.H., a nine-year-old child, for stealing an iPad

from his school as well as his physical resistance to efforts to constrain his combative

behavior.  In effectuating the arrest, the officer, Tina Maria Albrand, utilized a twist-lock,

---

[*] This order and judgment is an unpublished decision, not binding precedent.  10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id*.

a "control hold" in which the officer twists the suspect's hand to place "tension on the arm to get [him] to comply."[1] (Appellants' App'x, Vol. II at 348.)  Claiming the use of the twist-lock constituted excessive force in violation of the Fourth Amendment, C.G.H.'s guardians and grandparents, Britt and Craig Hawker (the Hawkers), brought this civil rights lawsuit against Albrand and her employer, the Sandy City Corporation (City). The determinative fact is exquisitely narrow:  whether Albrand resorted to the twist-lock immediately upon confronting C.G.H. or only after he grabbed her arm.  The district judge found the record, viewed in the light most favorable to the Hawkers, to reveal Albrand's use of the twist-lock occurred only after C.G.H. grabbed her arm.  He concluded the use of the twist-lock in these circumstances did not constitute excessive force in violation of the Fourth Amendment.  We agree on both counts and affirm.

## I. BACKGROUND

The parties are familiar with the facts and we need not recite them in depth. Suffice to say, the facts, taken in the light most favorable to the Hawkers, *see Scott v. Harris*, 550 U.S. 372, 378 (2007), reveal the following.[2]  Nine-year-old C.G.H. stole an

---

[1] Albrand testified a twist-lock, if done properly, should prevent a suspect from grabbing or kicking.  Our case law describes the twist-lock as a technique in which an officer grabs a suspect's hand and twists to tighten up the arm.  The maneuver allows the officer to twist the arm further if the suspect begins to fight or otherwise resist.  The idea is to painfully, but without intentional injury, distract the suspect from what he is doing (fighting or resisting). *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1249 (10th Cir. 2007); *United States v. Novitsky*, 58 F. App'x 432, 433-34 (10th Cir. 2003) (unpublished).

[2] The defendants' version of the event differs significantly from that of the Hawkers.

iPad from his elementary school. The principal caught him with the iPad and took it away; C.G.H. was not happy. A struggle ensued between him and three school employees. C.G.H. attempted to hit, bite, and head-butt the employees. They eventually restrained C.G.H. in a Mandt hold, where one employee placed her arms around C.G.H.'s torso while the other two held his legs. In the midst of the struggle, Britt and Albrand[3] were called to come to the school.

Britt arrived first. After she talked with C.G.H., he began to calm down and the employees released their hold on him. Albrand arrived shortly thereafter. Prior to her arrival, Albrand did not know C.G.H. had been physically combative with the school employees, but she had received two phone calls from the secretarial staff requesting her assistance.[4] (Appellants' App'x, Vol. II at 359-60.) Upon arrival, Albrand encountered a peculiar circumstance. C.G.H. was sitting on the floor in the hallway against a wall. The principal, school psychologist, and Britt were sitting on the floor across from him. The principal told Albrand she wanted to file theft charges against C.G.H. Albrand approached C.G.H. and told him: "We can do this the easy way by you talking to me, or we can do this the difficult way or hard way by you not talking to me." (Appellants' App'x, Vol. I at 262.1.) C.G.H. looked up at her but said nothing. Albrand "grabbed"

---

[3] At the time of the incident, Albrand was assigned to the Youth Unit of the City's police department. Among other duties, a Youth Unit officer (also referred to as a School Resource Officer) responds to crimes occurring in the local schools.

[4] The first call advised Albrand that the principal required her assistance as there was an incident. The second call was to inquire how much longer Albrand was going to be as the situation had escalated and for her to come as soon as she could.

his arm and "yanked" him up off the floor.  (*Id.*)  In response, C.G.H. grabbed her arm.  Albrand put him in a twist-lock, pushed him against the wall, and handcuffed him.  C.G.H. kicked at Albrand and cried "You're hurting me."  (*Id.*)  Albrand escorted him to the principal's office where she issued him a citation for theft.  Britt took C.G.H. to the doctor's office later that day; he was treated for a possible hairline fracture to his left clavicle (collarbone).  C.G.H. suffered anxiety and post-traumatic stress as a result of his encounter with Albrand.

The Hawkers brought this 42 U.S.C. § 1983 lawsuit on behalf of C.G.H. against Albrand and the City.  Albrand moved for summary judgment, arguing no constitutional violation occurred or, in the alternative, she was entitled to qualified immunity.  The City also moved for summary judgment contending it could not be liable because there was no underlying constitutional violation.

The district judge granted summary judgment to both Albrand and the City.  He concluded Albrand was entitled to qualified immunity because her actions did not rise to a constitutional violation.[5]  Relevant here, he determined the record did not support the

---

[5] Technically, qualified immunity does not come into play if there has been no constitutional or statutory violation.  It provides immunity to public officials who violate established rights but are reasonably unaware of a problem because the right was not clearly established when the violation occurred.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also Davis v. Scherer*, 468 U.S. 183, 190 (1984) ("Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under

(Continued . . . )

Hawkers' claim that Albrand immediately placed C.G.H. in a twist-lock upon confronting

him.  Rather, the evidence showed C.G.H. (at the very least) grabbed for Albrand's arm

before she placed him in the twist-lock.  Under these circumstances, the judge decided,

the use of the twist-lock was objectively reasonable under the Fourth Amendment, and

because Albrand did not commit a constitutional violation, the City could not be held

liable under § 1983.

## II. STANDARD OF REVIEW

Our review of this summary judgment is de novo.  *Jiron v. City of Lakewood*, 392

F.3d 410, 414 (10th Cir. 2004).  In general, a summary judgment may be entered only "if

the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But a summary

judgment in this context differs from that generally applied.  *Martinez v. Beggs*, 563 F.3d

1082, 1088 (10th Cir. 2009).  "When a defendant asserts qualified immunity at summary

judgment, the burden shifts to the plaintiff to show that:  (1) the defendant violated a

constitutional right and (2) the constitutional right was clearly established."  *Id.*  We have

discretion to decide "which of the two prongs of the qualified immunity analysis should

---

the applicable standard.").  But because the Supreme Court has broken down the burden
of plaintiffs in a qualified immunity case into two prongs—a constitutional violation and
clearly established law—courts often mistakenly grant qualified immunity to officials
when a plaintiff fails to satisfy his burden as to the first (violation) prong. *See Saucier v.
Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223,
236 (2009).  Technicalities aside, the district judge properly granted summary judgment
to Albrand and the City as no Fourth Amendment violation occurred.

be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### III. DISCUSSION

The Hawkers are not claiming Albrand's yanking C.G.H. from the floor by his arm constitutes excessive force.  Nor are they challenging the existence of probable cause to arrest him for theft or the use of handcuffs in the arrest.  The only issue is whether Albrand's use of a twist-lock to effectuate the arrest constitutes excessive force under the Fourth Amendment.

As the Hawkers would have it, the facts viewed in their favor show Albrand immediately resorted to use of the twist-lock upon confronting C.G.H. [6]  Because he was not resisting at that time, they say, the use of the twist-lock was objectively unreasonable.

But, according to Britt, Albrand only resorted to use of the twist-lock after C.G.H grabbed her arm:

> [W]hen [Albrand] did get there, she come down the hallway and she looked, and [the principal] told her she wanted to file charges.  And [Albrand] said, "Okay."  And so [Albrand] walked over to [C.G.H.], and she looked down at [him], and she told [him], "We can do this the easy way by you talking to me, or we can do this the difficult way or hard way by you not talking to me."

---

[6] See *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) ("In determining whether a plaintiff's constitutional rights were violated[,] we ordinarily . . . adopt plaintiff's version of the facts, insofar as it is supported by the record."); *see also Scott*, 550 U.S. at 378 ("[At the summary judgment stage,] courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.  In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.") (citations and quotations omitted).

[C.G.H.] looked up at her. She grabbed [his] arm, yanked him up off the floor, put him in a twist lock. When she grabbed his arm – when *she yanked him off the floor, he grabbed her arm, she put him in a twist lock, she put him against the wall, put him in handcuffs and marched him down the hall.* [C.G.H.] was kicking and he was crying, "You're hurting me."

(Appellants' App'x, Vol. I at 262.1 (emphasis added).) Later in her deposition, she reiterated (twice) that when Albrand grabbed C.G.H.'s arm, *he immediately grabbed her arm*.

Despite Britt's clear testimony, the Hawkers attempt to create a genuine dispute of material fact by pointing to Albrand's answer to a Request for Admission and a report of the officer who investigated the incident. According to the Hawkers, both show Albrand applied the twist-lock when C.G.H. would not comply with her verbal commands to stand up. But neither Albrand's "admission" nor the investigating officer's report reveal a legal factual dispute.

In the Request for Admission, the Hawkers asked Albrand to admit she used excessive force against C.G.H. Albrand denied using excessive force explaining, in relevant part: "When C.G.H. did not comply with [her] verbal commands to accompany her to [the] school's office, she attempted to use a light twist lock technique to achieve C.G.H.'s compliance. C.G.H. resisted [her] efforts and began to kick and grab at Defendant, and at one point grabbed hold of [her] gun . . . ." (Appellants' App'x, Vol. II at 375.) The Hawkers place more weight on this "admission" than it can reasonably bear.

It merely states Albrand "attempted" to use a light twist-lock to gain C.G.H.'s compliance but C.G.H. resisted her efforts.[7]

Similarly, the Hawkers take the investigating officer's report out of context. In his report, the officer provides a synopsis of the incident, taken from his reading of Albrand's police report and the school employees' witness statements. That synopsis states: "Because [C.G.H.] was refusing to stand up or go to the Principals office, Officer Albrand placed him in a control hold and lifted him to a position where she could place him in handcuffs." (*Id.* at 400.) But, prior to the quote, the investigator reports that not only did C.G.H. refuse to stand up, "[h]e was also physically resisting Officer Albrand." (*Id.*) The report goes on: "In an attempt to lift [C.G.H.] to a position to place cuffs on him, [C.G.H.] was physically resisting and struggling in an attempt to escape custody." (*Id.*) The investigator did not say Albrand resorted to use of the twist-lock only because C.G.H. was not complying with her verbal commands but also because he was physically resisting.

---

[7] According to the Hawkers, Albrand's deposition testimony affirmed the accuracy of her response to the Request for Admission (prepared by her attorney). Not so. At her deposition, the Hawkers' attorney read Albrand's response to the Request for Admission and then asked: "So, you appear to be saying you actually used the twist lock when he did not respond to your verbal commands, correct?" (Appellants' App'x, Vol. II at 351.) She replied: "Correct." (*Id.*) Her reply acknowledges what is written in the response to the Request for Admission; it does not concede her resort to the twist-lock occurred when C.G.H. did not respond to her verbal commands (as opposed to when he grabbed her arm). Indeed, immediately after this exchange, Albrand clarified that she did not use the twist-lock until C.G.H. began physically resisting her and grabbing for her gun.

Since Albrand's use of the twist-lock was both preceded and precipitated by C.G.H. grabbing her arm, we now turn to whether her acts support a Fourth Amendment violation. Both parties agree to this: the issue turns on whether Albrand's use of the twist-lock was "'objectively reasonable' in light of the facts and circumstances confronting [her], without regard to [her] underlying intent or motivation."[8] *See Graham v. Connor*, 490 U.S. 386, 397 (1989). "In considering this question, we are mindful that the Fourth Amendment does not require police to use the least intrusive means in the course of a detention, only reasonable ones." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (quotations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396. We must judge the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Though the Fourth Amendment's reasonableness inquiry notoriously eludes easy formula or bright line rules, the Supreme Court has delineated

---

[8] We have uncovered no case law (and the parties cite to none) applying a different standard when the victim of the alleged excessive force is a minor. Indeed, in *Holland ex rel. Overdorff v. Harrington*, we applied *Graham* to conclude members of a police SWAT team violated the Fourth Amendment when they continued to hold child bystanders at gunpoint even "after the officers had gained complete control of the situation." 268 F.3d 1179, 1188, 1193 (10th Cir. 2001).

three, non-exclusive factors relevant to our excessive force inquiry: [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Fisher*, 584 F.3d at 894 (quoting *Graham*, 490 U.S. at 396).

The first *Graham* factor weighs in favor of the Hawkers. The crime at issue was Class B misdemeanor theft, a relatively minor offense. *See* Utah Code Ann. §§ 76-6-404, 76-6-412(1)(d); *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (because the offense involved was only a petty misdemeanor, the least serious crime in New Mexico, "the amount of force should have been reduced accordingly"); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (because the officer confronted suspect "who had committed a misdemeanor in a particularly harmless manner, . . . the level of force that was reasonable for him to use" was reduced).

The second and third factors, however, weigh against the Hawkers. Albrand could objectively and reasonably view C.G.H.'s grabbing her arm as resisting arrest and escalating a tense situation. For safety, it was objectively reasonable for Albrand to deescalate the situation and command C.G.H.'s compliance by using a twist-lock. *See Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1031 (10th Cir. 1997) (use of arm bar maneuver and take-down on aggressive suspect during *Terry* stop reasonable to protect officers' safety); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781–82 (10th Cir. 1993) (wrestling suspect to ground and using a stun gun not unreasonable where suspect was resisting arrest).

C.G.H. was only nine-years-old and weighed 67 pounds at the time of the incident. His age and size are certainly factors in the totality-of-the-circumstances reasonableness calculation. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) ("Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances."). However, these factors alone do not render force used against him unreasonable per se. In fact, we need not look far for proof that even a young child is capable of physical violence— C.G.H. had been physically combative towards the school employees prior to Albrand's arrival, requiring the efforts of three individuals to restrain him. Indeed, it is with alarming frequency that we are confronted with stories in the news of acts of violence at the hands of minors. An arrestee's age and small demeanor do not necessarily undermine an officer's concern for safety and need to control the situation.

The cases relied on by the Hawkers are inapposite. *See Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012); *Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007). Each involved the use of force on an individual posing no immediate threat to the officer. *Morris*, 672 F.3d at 1196 (forceful "throw down" of non-resisting unarmed individual); *Novitsky*, 491 F.3d at 1255 (use of twist-lock maneuver on non-resisting individual lying in fetal position in parked car during a welfare check). Here, in contrast, C.G.H grabbed

Albrand's arm, an action a reasonable officer could objectively view as an act of violent resistance.[9]

The facts in this case are unfortunate in all respects. It is regrettable that a police officer feels a need to resort to physical force, handcuffs, and arrest in order to gain control of and reason with a nine-year-old child. Equally regrettable is the disrespectful, obdurate, and combative behavior of that nine-year-old child. In any event, given C.G.H.'s resistance, Albrand's actions in this case simply do not rise to the level of a constitutional violation. And because Albrand committed no constitutional violation, the City cannot be held liable. *See Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established . . . that a municipality cannot be held liable under [§] 1983 for the acts of an employee if . . . the municipal employee committed no constitutional violation.").

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

_____

[9] Every other witness on scene testified C.G.H. resisted arrest. According to Albrand, she placed her left hand on C.G.H.'s left hand and her right hand on C.G.H.'s left elbow to help him up off the floor. In response, C.G.H. kicked at her legs. He also grabbed for her duty belt, taking hold of the grip of her gun. The principal testified Albrand helped C.G.H. up off the floor and he physically resisted by kicking and flailing his arms. Although her view was obstructed, the school psychologist recalled C.G.H. kicking his feet out at Albrand. She also said he appeared "aggressive" and "uncooperative." (Appellant's App'x, Vol. II at 366-68.)

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

BRITT JOY HAWKER; CRAIG DEE
HAWKER, as guardians for C.G.H., a
minor,

        Plaintiffs–Appellants,

v.

SANDY CITY CORPORATION;
OFFICER TINA MARIA ALBRAND,

        Defendants–Appellees.

No. 13-4139
(D.C. No.: 2:12-CV-00001-RSJ)
(D. Utah)

---

## PUBLISHED CONCURRENCE

---

**LUCERO**, J., concurring:

But for the current state of the law, I would dissent. Given our present

jurisprudence in this circuit, however, I agree with the result my colleagues reach and

accordingly respectfully concur.[1] I write separately to express my disagreement with our

jurisprudence, which stems from what I consider to be an improperly and inadequately

developed state of the law for treating childhood criminal behavior. It is time for a

---

[1] My colleagues' nonprecedential order and judgment, in which I concur, is
Hawker v. Sandy City, No. 13-4139 (10th Cir. Dec. 5, 2014) (unpublished).

change in our jurisprudence that would deal with petty crimes by minors in a more enlightened fashion and would not automatically extend qualified immunity for conduct such as occurred in this case.

We have before us the following situation: A nine-year-old child has admittedly taken an iPad from school. His grandmother, commendably, sees the iPad at home and admonishes and directs him to return it to his school. So far, so good. In the process of returning the iPad, things go awry. The principal sees the child with the iPad, and after the child refuses to give it up, a school employee grabs it from his hands. A struggle ensues, with the child attempting to hit, kick, and head-butt three school employees, who eventually restrain him. When his grandmother is called, the child calms down. A police officer is also called, and the principal tells the officer she wants theft charges filed. While the child's grandmother looks on, the officer grabs the 67-pound child by the arm and yanks him off the floor, and then, after the child grabs the officer's arm, the officer puts him in a twist-lock, slams him against the wall, and handcuffs him.

These facts compel me to comment on the potential future consequences to the child and the ordeal suffered by the family at the center of this case and the broader phenomenon it unfortunately represents. The criminal punishment of young schoolchildren leaves permanent scars and unresolved anger, and its far-reaching impact on the abilities of these children to lead future prosperous and productive lives should be a matter of grave concern for us all. Focusing narrowly on the legal standards applicable

- 2 -

in this case renders it too easy to overlook the obvious question: Why are we arresting

nine-year-old schoolchildren?[2] Concededly, a nine-year-old is no longer in a bassinette,

yet that age group is a great deal closer to a pram than to graduation from high school.

I would like to believe that C.G.H.'s experience is uncommon, particularly for

such a young child. Those who monitor the conditions of our schools, however, tell us

otherwise. Police presence in educational settings, including elementary schools, is

pervasive. See Jason B. Langberg & Barbara A. Fedders, How Juvenile Defenders Can

Help Dismantle the School-to-Prison Pipeline: A Primer on Educational Advocacy and

Incorporating Clients' Educational Histories and Records into Delinquency

Representation, 42 J.L. & Educ. 653, 656 (2013) ("Armed police officers now can be

found in public schools around the country in drastically increased numbers. According

to the most recent national estimates, 17,000 law enforcement officers—often termed

'school resource officers' (SROs)—are assigned permanently to schools."); see also

Catherine Y. Kim, Policing School Discipline, 77 Brook. L. Rev. 861, 878 (2012)

("Jurisdictions lacking the resources to hire full-time police personnel nonetheless may

---

[2] Others have noted that a narrow focus on legal standards can blind us to the real impact of our decisions on children's lives. See, e.g., Ratner v. Loudoun Cnty. Pub. Sch., 16 F. App'x 140, 143 (4th Cir. 2001) (unpublished) (Hamilton, J., concurring) (stating that although "constrained to concur" in the majority opinion denying a child's constitutional claims relating to excessive school punishment, "I write separately to express my compassion for Ratner, his family, and common sense"); Hedgepeth v. Wash. Metro. Area Transit, 284 F. Supp. 2d 145, 160 (D.D.C. 2003), aff'd sub nom. Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth., 386 F.3d 1148 (D.C. Cir. 2004) (noting that, although the arrest of a child was constitutional under the applicable legal standard, "the Court can hardly overlook the humiliating and demeaning impact of the arrest" on that child).

regularly summon the local police department through calls for service."). "This phenomenon is not limited to middle and high school students. Shocking stories of children as young as six years old who are suspended, handcuffed, arrested, and detained appear with some frequency." Langberg & Fedders, 42 J. L. & Educ. at 658. This case presents but one such incident.

Police presence in schools is of course intended to serve the best interests of students and communities. Situations such as those at Sandy Hook and Columbine, as well as fears of rising school violence in recent decades, necessitate security in American schools.[3] See Ratner, 16 F. App'x at 143. So do policies adopted to address drug and gang problems. But it does not follow from the necessity of school security officers that elementary schoolchildren of a tender age need to be manhandled into a criminal law system in which they are treated as if they were hardened criminals and with a lack of finesse. Cf. id. (noting that the policy in question "has stripped away judgment and discretion on the part of those administering it").

Referral of students to law enforcement—so that even minor offenses are often dealt with and punished by police rather than school officials—is a key and growing

---

[3] The nation's second deadliest school shooting occurred in December 2012 at the Sandy Hook Elementary School in Newtown, Connecticut. See James Barron, "A Nation Reels After Gunman Massacres 20 Children at School in Connecticut," N.Y. Times, Dec 14, 2012, http://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html. A recent Connecticut case describes the incident vividly: "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators." Shew v. Malloy, 994 F. Supp. 2d 234, 259 (D. Conn. 2014) (quoting Connecticut Senate Session Transcript for April 3, 2013).

feature of modern school disciplinary policies. See N.C. v. Commonwealth, 396 S.W.3d 852, 863 (Ky. 2013) (observing the "shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions, not just in drug cases, but also in common school misbehavior that ends up in the juvenile justice system," and that "[t]his comes at a significant cost to state agencies and takes the student out of the normal education process, in addition to putting these students in contact with students who committed violent offenses, gang members, or other bad influences"). "The use of force by school police—in the form of physical restraints, non-lethal weapons, or firearms—is another example of traditional police methods migrating into school settings." Tex. Appleseed, Texas' School-to-Prison Pipeline: Ticketing, Arrest & Use of Force in Schools 119 (2010), available at http://www.njjn.org/uploads/digital-library/Texas-School-Prison-Pipeline_Ticketing_Booklet_Texas-Appleseed_Dec2010.pdf. In the instant matter, it was Principal Webb who oversaw the officer's conduct and insisted that C.G.H. be cited for theft.

As C.G.H.'s experience typifies, "the presence of police in schools [has] had the effect of 'criminalizing' behaviors—such as minor scuffles, thefts, and 'disruptions of school assembly'—that would otherwise be handled by school officials." Lisa H. Thurau & Johanna Wald, Controlling Partners: When Law Enforcement Meets Discipline in Public Schools, 54 N.Y.L. Sch. L. Rev. 977, 981 (2009/2010). Children are often "unaware of some of the more nuanced aspects of the law, or the extent of an officer's discretion, which can result in charges for less overt wrongdoing or passive participation leading to joint venture charges, disorderly conduct, simple assault, and resisting arrest."

Id. at 985.  These difficulties are evident in C.G.H.'s interaction with Officer Albrand.

Strict disciplinary policies coupled with the involvement of the criminal justice system in schools have recently gained a name:  the school-to-prison pipeline.  The phrase "refers to the practice of funneling students currently enrolled in school to the juvenile justice system or removing students from school temporarily or permanently, thereby creating conditions under which the students are more likely to end up in prison." Jason P. Nance, School Surveillance and the Fourth Amendment, 2014 Wis. L. Rev. 79, 83.  Over the last two decades, experts from many fields have documented the myriad negative consequences of the school-to-prison pipeline.  In addition to missing school when they are suspended or expelled, students who experience the harsh effects of these policies are more likely to struggle in classes, drop out, and suffer other negative effects on their educations.  See Udi Ofer, Criminalizing the Classroom: The Rise of Aggressive Policing and Zero Tolerance Discipline in New York City Public Schools, 56 N.Y.L. Sch. L. Rev. 1373 (2011/2012); see also Deb Delisle, Asst. Sec'y Elementary & Secondary Ed., "Asst. Secretary Delisle and Youth Lend Their Voices to Combatting the School-to-Prison Pipeline," Homeroom: The Official Blog of the U.S. Department of Education, http://www.ed.gov/blog/2012/12/asst-secretary-delisle-and-youth-lend-their-voices-to-combatting-the-school-to-prison-pipeline/ (collecting statistics on the negative impacts of the school-to-prison pipeline).  They are also more likely to become entangled in the juvenile and criminal justice systems.  Ofer, 59 N.Y.L. Sch. L. Rev. at 1401 ("Children who are removed from the learning environment, even for a few days, are more likely to drop out, use drugs, face emotional challenges, become involved with the juvenile justice

system, and develop criminal records as adults.").

"In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954). Although the Court initially penned those words sixty years ago, they continue to ring true today. And as Brown taught us, the judiciary can be an essential tool in ameliorating the barriers to education for our children and grandchildren. Although the phrase "school-to-prison pipeline" has become "part of the national lexicon," Thurau & Wald, 54 N.Y.L. Sch. L. Rev. at 981, it has yet to enter the lexicon of our courts. But see Hinds Cnty. Sch. Dist. Bd. of Trustees v. R.B. ex rel. D.L.B., 10 So. 3d 387, 412 (Miss. 2008.) (Graves, J., dissenting) (discussing "school-to-prison pipeline"). Clearly, aspects of the school-to-prison pipeline are more properly suited for resolution by policymakers and social scientists. But C.G.H. and thousands of other children needlessly thrust into the criminal justice system deserve better.

It is no doubt correct that early and positive intervention by family and educators will best realign an elementary school child's errant behavior and most likely lead to a productive life. That should be the educational goal of our school system in dealing with cases such as the one before us. It should be a societal goal. Our present jurisprudence is sending the wrong message to schools. It makes it too easy for educators to shed their significant and important role in that process and delegate it to the police and courts. We should change course and instead leave it to the factfinder to determine whether the handcuffing of six- to nine-year-old children is excessive force rather than giving schools and police a bye by holding them immune from liability. A more enlightened approach

to elementary school discipline by educators, police, and courts will enhance productive

lives and help break the school-to-prison chain.

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

BRITT JOY HAWKER; CRAIG DEE
HAWKER, as guardians for C.G.H., a
minor,

        Plaintiffs–Appellants,

v.

SANDY CITY CORPORATION;
OFFICER TINA MARIA ALBRAND,

        Defendants–Appellees.

No. 13-4139
(D.C. No.: 2:12-CV-00001-RJS)
(D. Utah)

PUBLISHED CONCURRENCE

**LUCERO**, J., concurring:

       But for the current state of the law, I would dissent. Given our present

jurisprudence in this circuit, however, I agree with the result my colleagues reach and

accordingly respectfully concur.[1] I write separately to express my disagreement with our

jurisprudence, which stems from what I consider to be an improperly and inadequately

developed state of the law for treating childhood criminal behavior. It is time for a

---

[1] My colleagues' nonprecedential order and judgment, in which I concur, is
Hawker v. Sandy City, No. 13-4139 (10th Cir. Dec. 5, 2014) (unpublished).

change in our jurisprudence that would deal with petty crimes by minors in a more enlightened fashion and would not automatically extend qualified immunity for conduct such as occurred in this case.

We have before us the following situation: A nine-year-old child has admittedly taken an iPad from school. His grandmother, commendably, sees the iPad at home and admonishes and directs him to return it to his school. So far, so good. In the process of returning the iPad, things go awry. The principal sees the child with the iPad, and after the child refuses to give it up, a school employee grabs it from his hands. A struggle ensues, with the child attempting to hit, kick, and head-butt three school employees, who eventually restrain him. When his grandmother is called, the child calms down. A police officer is also called, and the principal tells the officer she wants theft charges filed. While the child's grandmother looks on, the officer grabs the 67-pound child by the arm and yanks him off the floor, and then, after the child grabs the officer's arm, the officer puts him in a twist-lock, slams him against the wall, and handcuffs him.

These facts compel me to comment on the potential future consequences to the child and the ordeal suffered by the family at the center of this case and the broader phenomenon it unfortunately represents. The criminal punishment of young schoolchildren leaves permanent scars and unresolved anger, and its far-reaching impact on the abilities of these children to lead future prosperous and productive lives should be a matter of grave concern for us all. Focusing narrowly on the legal standards applicable

-2-

in this case renders it too easy to overlook the obvious question: Why are we arresting nine-year-old schoolchildren?[2] Concededly, a nine-year-old is no longer in a bassinette, yet that age group is a great deal closer to a pram than to graduation from high school.

I would like to believe that C.G.H.'s experience is uncommon, particularly for such a young child. Those who monitor the conditions of our schools, however, tell us otherwise. Police presence in educational settings, including elementary schools, is pervasive. See Jason B. Langberg & Barbara A. Fedders, How Juvenile Defenders Can Help Dismantle the School-to-Prison Pipeline: A Primer on Educational Advocacy and Incorporating Clients' Educational Histories and Records into Delinquency Representation, 42 J.L. & Educ. 653, 656 (2013) ("Armed police officers now can be found in public schools around the country in drastically increased numbers. According to the most recent national estimates, 17,000 law enforcement officers—often termed 'school resource officers' (SROs)—are assigned permanently to schools."); see also Catherine Y. Kim, Policing School Discipline, 77 Brook. L. Rev. 861, 878 (2012) ("Jurisdictions lacking the resources to hire full-time police personnel nonetheless may

---

[2] Others have noted that a narrow focus on legal standards can blind us to the real impact of our decisions on children's lives. See, e.g., Ratner v. Loudoun Cnty. Pub. Sch., 16 F. App'x 140, 143 (4th Cir. 2001) (unpublished) (Hamilton, J., concurring) (stating that although "constrained to concur" in the majority opinion denying a child's constitutional claims relating to excessive school punishment, "I write separately to express my compassion for Ratner, his family, and common sense"); Hedgepeth v. Wash. Metro. Area Transit, 284 F. Supp. 2d 145, 160 (D.D.C. 2003), aff'd sub nom. Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth., 386 F.3d 1148 (D.C. Cir. 2004) (noting that, although the arrest of a child was constitutional under the applicable legal standard, "the Court can hardly overlook the humiliating and demeaning impact of the arrest" on that child).

regularly summon the local police department through calls for service."). "This phenomenon is not limited to middle and high school students. Shocking stories of children as young as six years old who are suspended, handcuffed, arrested, and detained appear with some frequency." Langberg & Fedders, 42 J. L. & Educ. at 658. This case presents but one such incident.

Police presence in schools is of course intended to serve the best interests of students and communities. Situations such as those at Sandy Hook and Columbine, as well as fears of rising school violence in recent decades, necessitate security in American schools.[3] See Ratner, 16 F. App'x at 143. So do policies adopted to address drug and gang problems. But it does not follow from the necessity of school security officers that elementary schoolchildren of a tender age need to be manhandled into a criminal law system in which they are treated as if they were hardened criminals and with a lack of finesse. Cf. id. (noting that the policy in question "has stripped away judgment and discretion on the part of those administering it").

Referral of students to law enforcement—so that even minor offenses are often dealt with and punished by police rather than school officials—is a key and growing

_____

[3] The nation's second deadliest school shooting occurred in December 2012 at the Sandy Hook Elementary School in Newtown, Connecticut. See James Barron, "A Nation Reels After Gunman Massacres 20 Children at School in Connecticut," N.Y. Times, Dec 14, 2012, http://www.nytimes.com/2012/12/15/nyregion/shooting-reported-at-connecticut-elementary-school.html. A recent Connecticut case describes the incident vividly: "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators." Shew v. Malloy, 994 F. Supp. 2d 234, 259 (D. Conn. 2014) (quoting Connecticut Senate Session Transcript for April 3, 2013).

feature of modern school disciplinary policies.  See N.C. v. Commonwealth, 396 S.W.3d 852, 863 (Ky. 2013) (observing the "shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions, not just in drug cases, but also in common school misbehavior that ends up in the juvenile justice system," and that "[t]his comes at a significant cost to state agencies and takes the student out of the normal education process, in addition to putting these students in contact with students who committed violent offenses, gang members, or other bad influences").  "The use of force by school police—in the form of physical restraints, non-lethal weapons, or firearms—is another example of traditional police methods migrating into school settings."  Tex. Appleseed, Texas' School-to-Prison Pipeline:  Ticketing, Arrest & Use of Force in Schools 119 (2010), available at http://www.njjn.org/uploads/digital-library/Texas-School-Prison-Pipeline_Ticketing_Booklet_Texas-Appleseed_Dec2010.pdf.  In the instant matter, it was Principal Webb who oversaw the officer's conduct and insisted that C.G.H. be cited for theft.

As C.G.H.'s experience typifies, "the presence of police in schools [has] had the effect of 'criminalizing' behaviors—such as minor scuffles, thefts, and 'disruptions of school assembly'—that would otherwise be handled by school officials."  Lisa H. Thurau & Johanna Wald, Controlling Partners:  When Law Enforcement Meets Discipline in Public Schools, 54 N.Y.L. Sch. L. Rev. 977, 981 (2009/2010).  Children are often "unaware of some of the more nuanced aspects of the law, or the extent of an officer's discretion, which can result in charges for less overt wrongdoing or passive participation leading to joint venture charges, disorderly conduct, simple assault, and resisting arrest."

Id. at 985.  These difficulties are evident in C.G.H.'s interaction with Officer Albrand.

Strict disciplinary policies coupled with the involvement of the criminal justice system in schools have recently gained a name:  the school-to-prison pipeline.  The phrase "refers to the practice of funneling students currently enrolled in school to the juvenile justice system or removing students from school temporarily or permanently, thereby creating conditions under which the students are more likely to end up in prison." Jason P. Nance, School Surveillance and the Fourth Amendment, 2014 Wis. L. Rev. 79, 83.  Over the last two decades, experts from many fields have documented the myriad negative consequences of the school-to-prison pipeline.  In addition to missing school when they are suspended or expelled, students who experience the harsh effects of these policies are more likely to struggle in classes, drop out, and suffer other negative effects on their educations.  See Udi Ofer, Criminalizing the Classroom: The Rise of Aggressive Policing and Zero Tolerance Discipline in New York City Public Schools, 56 N.Y.L. Sch. L. Rev. 1373 (2011/2012); see also Deb Delisle, Asst. Sec'y Elementary & Secondary Ed., "Asst. Secretary Delisle and Youth Lend Their Voices to Combatting the School-to-Prison Pipeline," Homeroom: The Official Blog of the U.S. Department of Education, http://www.ed.gov/blog/2012/12/asst-secretary-delisle-and-youth-lend-their-voices-to-combatting-the-school-to-prison-pipeline/ (collecting statistics on the negative impacts of the school-to-prison pipeline).  They are also more likely to become entangled in the juvenile and criminal justice systems.  Ofer, 59 N.Y.L. Sch. L. Rev. at 1401 ("Children who are removed from the learning environment, even for a few days, are more likely to drop out, use drugs, face emotional challenges, become involved with the juvenile justice

system, and develop criminal records as adults.").

"In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Bd. of Educ., 347 U.S. 483, 493 (1954). Although the Court initially penned those words sixty years ago, they continue to ring true today. And as Brown taught us, the judiciary can be an essential tool in ameliorating the barriers to education for our children and grandchildren. Although the phrase "school-to-prison pipeline" has become "part of the national lexicon," Thurau & Wald, 54 N.Y.L. Sch. L. Rev. at 981, it has yet to enter the lexicon of our courts. But see Hinds Cnty. Sch. Dist. Bd. of Trustees v. R.B. ex rel. D.L.B., 10 So. 3d 387, 412 (Miss. 2008.) (Graves, J., dissenting) (discussing "school-to-prison pipeline"). Clearly, aspects of the school-to-prison pipeline are more properly suited for resolution by policymakers and social scientists. But C.G.H. and thousands of other children needlessly thrust into the criminal justice system deserve better.

It is no doubt correct that early and positive intervention by family and educators will best realign an elementary school child's errant behavior and most likely lead to a productive life. That should be the educational goal of our school system in dealing with cases such as the one before us. It should be a societal goal. Our present jurisprudence is sending the wrong message to schools. It makes it too easy for educators to shed their significant and important role in that process and delegate it to the police and courts. We should change course and instead leave it to the factfinder to determine whether the handcuffing of six- to nine-year-old children is excessive force rather than giving schools and police a bye by holding them immune from liability. A more enlightened approach

to elementary school discipline by educators, police, and courts will enhance productive lives and help break the school-to-prison chain.