NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  16a0328n.06

Case No. 14-4066

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 16, 2016
DEBORAH S. HUNT, Clerk

SANDRA WILLIAMS,                          )
                                          )
 *Plaintiff-Appellee*,               )
                                          )
  v.                             ) **ON APPEAL FROM THE**
                                          ) **UNITED STATES DISTRICT**
JON MORGAN,                               ) **COURT FOR THE NORTHERN**
                                          ) **DISTRICT OF OHIO**
 *Defendant-Appellant*.               )
                                          )

Before:  BATCHELDER and STRANCH, Circuit Judges; and HOOD, District Judge.[*]

**ALICE M. BATCHELDER, Circuit Judge.**  In this interlocutory appeal from a denial

of a motion for summary judgment, the defendant police officer, Jon Morgan, argues that the

plaintiff's evidence did not create a genuine dispute of material fact so as to overcome his

assertion of qualified immunity.  We establish our appellate jurisdiction and AFFIRM.

**I.**

The defendant-appellant in this appeal, Officer Jon Morgan, is an Akron (Ohio) Police

Officer, assigned as the School Resource Officer (SRO) at the Jennings Community Learning

Center (CLC), a public middle school.  The plaintiff-appellee, Sandra Williams, is the mother of

a female minor, T.W., who claims that Officer Morgan used excessive force when physically

restraining and bodily seizing T.W. in response to T.W.'s misbehavior at the school.  At the time

of the incident, October 26, 2012, T.W. was a 13-year-old, eighth grade student, who had just

transferred to Jennings CLC the day before, due to disciplinary problems at her prior school.

Officer Morgan had been an SRO at the Jennings CLC since 2010.  Two additional facts bear

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

mention: (1) during this incident, Officer Morgan broke T.W.'s arm; and (2) much of the incident was captured by video surveillance, albeit without sound, and that video was properly before the district court and is before us here. This appeal concerns Officer Morgan's claim of qualified immunity in response to T.W.'s accusations of unlawful use of excessive force.

On the morning of Friday, October 26, 2012, T.W. and a classmate got into an argument sufficiently serious that their teacher sent them both to the principal's office. The principal met with each of them and suspended T.W. from school for five days, but did not discipline the other student. T.W. was admittedly upset, apparently enraged, by this outcome and, after leaving the principal's office, tore several paper posters from the school's walls. Officer Morgan characterized this tantrum as having "crossed the line to criminal disorderly conduct" and later that day confronted T.W. in a school stairwell. Deciding that T.W. was being defiant (by putting one foot behind her and her hands on her hips), Officer Morgan decided to seize her physically by pushing her up against the hallway lockers, bending her left arm behind her back, and eventually compelling her submission via this restraint. According to T.W., during this time, Officer Morgan was making threatening comments, whereas T.W. was pleading to be let go due to the pain in her arm. Eventually, still holding her by that arm, Officer Morgan escorted her to the principal's office. According to T.W., while they were waiting in the principal's office, Officer Morgan continued to hold her by that arm and to threaten her verbally.

The video captured the activity in the hallway, and though it lacks sound, the picture is reasonably clear. The stationary camera is affixed near the ceiling, recording the length of a hallway with lockers along the left and barren wall along the right, both interrupted by the occasional doorway or hallway. The video time stamp depicts the recording as beginning at 12:16 p.m., which appears to coincide with a class change as there are numerous students walking up or down the hallway (toward or away from the camera). Immediately to the right of

2

the camera, mostly out of view, is a doorway which apparently opens to the stairwell where the confrontation began. Before T.W. and Officer Morgan enter the view, the stream of students entering this doorway can be seen pausing and gawking, though they all continue on their way.

About 15 seconds into the video, T.W. and Officer Morgan enter the picture from this doorway (right side of the frame), as T.W. retreats backward and Officer Morgan pursues with his hands either on or reaching for her neck or upper chest. Officer Morgan is wearing a police uniform, including firearm, and he is significantly larger than T.W. As T.W. retreats into the middle of the hall (center of the frame) apparently attempting to fend off his hands with her own, Officer Morgan gets his hands on her enough to push her sharply against the lockers on the far side of the hall (left side of the frame). As she bounces off the lockers, he takes hold of her and turns her face-first into the lockers, leaning his weight against her and then taking hold of her left arm and bending it behind her back. Students continue to walk past and gawk, but none stop.

At this point, about 24 seconds into the recording, as Officer Morgan has T.W.'s left arm bent severely behind her back, both of her feet come up off the floor. T.W. is squirming for relief while Officer Morgan is leaning in with his face and mouth close to her ear and appears to be talking to her. For the next 15 seconds, Officer Morgan holds her there, her face against the lockers and left arm pinned behind her, apparently talking in her ear. Then he begins to walk her roughly down the hall (away from the camera), still holding her arm behind her as she squirms.

Officer Morgan directs her into the first doorway on the left, presumably the principal's office, and stands in that doorway for the next 60 seconds. He disappears fully into the doorway for about 45 seconds and reemerges without T.W. The video concludes with Officer Morgan walking up the hallway, toward the camera, until eventually passing beneath the camera.

T.W.'s sister took T.W. to the hospital a short time later where a doctor diagnosed her as having a broken arm (proximal humerus fracture). T.W. claims that Officer Morgan broke her

arm when he applied such force that he physically lifted her off of the ground. Ultimately, Officer Morgan did not actually arrest T.W. nor were criminal charges ever filed against her.

In March 2013, Sandra Williams, as T.W.'s Next Friend, filed suit in federal court, pursuant to 42 U.S.C. § 1983, claiming that Officer Morgan used excessive force during his physical seizure, restraint, and manipulation of T.W.[1] Specifically, T.W. accused Officer Morgan of needlessly accosting T.W. physically (ultimately breaking her arm) when she had offered no resistance, was not fleeing, and posed no threat to him or anyone else on the scene. Officer Morgan moved for summary judgment on grounds of qualified immunity, asserting that his use of force was appropriate under the circumstances, not excessive, because the technique he used was a low-level force, compliance tactic taught by the Akron Police Department.

The district court denied the motion based on its assessment of the record and its identification of genuine disputes of material fact for determination by a jury, concluding:

> Under the facts as viewed in a light most favorable to T.W., the [c]ourt cannot find that Morgan's conduct, as a matter of law, falls into this 'hazy border' [between excessive and acceptable force]. Herein, Morgan was confronted in a school setting with an unruly student—a situation handled by *teachers* on a routine basis without the use of *any* force. At the time of their encounter, T.W. posed no threat to the safety of Morgan or any other students. Accordingly, a reasonable jury could conclude that Morgan did not use *reasonable* force to bring T.W. under control. First, Morgan did not simply use an arm-bar to restrain T.W. He forced T.W. up against a stationary object—the metal lockers—to add to the force used. Moreover, given the huge massive size discrepancy [of Morgan over T.W.], Morgan physically lifted T.W. off the ground using the arm bar. This conduct, it would appear from the record, resulted in breaking T.W.'s arm.

> Moreover, there appears to exist a genuine issue of fact surrounding the immediate aftermath of the arm-bar. T.W. claims that she immediately asked Morgan to let go of her arm following the initial interaction because of the amount of pain she was in. Morgan, however, maintained his grip on T.W.'s arm and in fact directed her down the school hallway using that grip. Under those facts, a reasonable jury could conclude that such continued force was also

---

[1] She also raised other claims against other defendants, which caused those defendants to move for summary judgment on separate bases and the district court to rule on those motions. None of those claims, motions, or rulings is before us in this interlocutory appeal and, therefore, we have omitted substantive reference to them.

gratuitous. Accordingly, the [c]ourt declines to afford Morgan qualified immunity for his conduct.

*Williams v. Nice*, 58 F. Supp. 3d 833, 838 (N.D. Ohio 2014) (emphasis in original).

Officer Morgan filed this interlocutory appeal.

## II.

Officer Morgan argues that he is entitled to qualified immunity. Specifically, he presses four arguments in this appeal: (1) the district court improperly determined the facts and drew improper inferences; (2) on the proper facts and inferences, the force he used was not excessive; (3) the prohibition against such force was not clearly established; and (4) he is also entitled to qualified immunity under state law. Because the district court based its denial of qualified immunity on its determination that genuine disputes of material fact necessitated submission to a jury and because Officer Morgan challenges that determination, his challenge invokes a question concerning our jurisdiction. Thus we must first establish that we have appellate jurisdiction; then we must determine the extent or limitations of that jurisdiction; and only then may we exercise that jurisdiction to decide the merits of the argument that is properly before us.

## A.

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Id*. at 680. In so doing, the plaintiff must, at a minimum, offer sufficient

evidence to create a "genuine issue of fact," that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986).

If the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). The denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291 and is not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Thus, we may decide an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established. *Id*. We may also decide an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence. *See Plumhoff v. Rickard*, 572 U.S. --, 134 S. Ct. 2012, 2019 (2014); *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014). And we may decide, as a *legal* question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Plumhoff*, 134 S. Ct. at 2020.

We may not, however, decide an appeal challenging the district court's determination of "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Because such a challenge is purely fact-based, lacking any issue of law, it "does not present a legal question in the sense in which the term was used in *Mitchell*," *Plumhoff*, 134 S. Ct. at 2019, and is therefore not an appealable "final decision" within the meaning of 28 U.S.C. § 1291. These types of prohibited fact-based

("evidence sufficiency") appeals challenge only the plaintiff's allegations (and the district court's acceptance) of "what [actually] occurred[] or why an action was taken or omitted," *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011), who did it, *Johnson*, 515 U.S. at 307, or "nothing more than whether the evidence could support a [jury's] finding that particular conduct occurred," *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). We have also explained that the defendant-appellant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal. *See Romo v. Largen*, 723 F.3d 670, 673-74 (6th Cir. 2013).

In the event that legal and factual challenges are confused or entwined, "we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Roberson*, 770 F.3d at 402 (citing *Johnson*, 515 U.S. at 319) (quotation marks omitted). Similarly, we can separate an appellant's reviewable challenges from its unreviewable. *DiLuzio*, 796 F.3d at 610. That is, we can "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).

When we accept the district court's factual determinations and rely on the plaintiff's record evidence for the purpose of deciding the interlocutory appeal, we do not ourselves make any findings of fact or declare any inferences for purposes of any subsequent proceedings. *DiLuzio*, 796 F.3d at 611; *see also Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010) ("Whether [the plaintiff] is ultimately able to prove the alleged factual bases for his claims is a matter left for the finder of fact [on remand]—not the appellate court on interlocutory appeal.").

**B.**

Officer Morgan's first argument is that the district court misconstrued the evidence and drew improper inferences. He challenges the sufficiency of the plaintiff's evidence to prove her

claims, the district court's assessment of the events depicted in the video recording, and the inferences the district court drew from the evidence. Thus, as just explained, because we have no appellate jurisdiction over purely factual (evidence sufficiency) disputes, we must begin by separating his reviewable challenges from his unreviewable. *See DiLuzio*, 796 F.3d at 610.

**1.**

At her deposition, T.W. testified to her version of events. According to T.W., after the principal issued her a suspension, she waited in his office until the end of that class period and then proceeded to her next class on her understanding that she would finish the school day and begin the suspension the next day. R. 30-3 at 37-38; PageID # 592-93. Sometime later, but while class was in session and the hallways were otherwise empty, the principal located her and told her to return to his office to get her paperwork, at which point she ripped the posters from the wall, while still in the presence of the principal. R. 30-3 at 40-41; PageID # 595-96. She went to her locker and retrieved her cell phone, went downstairs to the main office and called her sister to pick her up, and then headed back upstairs to get the paperwork from the principal. R. 30-3 at 41-44; PageID # 596-99. At that point, she encountered Officer Morgan in the stairwell:

> T.W.  He looked at me, I looked at him. He asked me what I was looking at. I said I'm looking at you. Then he was like, I was trying to ignore you. Then he was like - - he just grabbed me and threw me into the lockers.

R. 30-3 at 46; PageID # 601. Upon some clarification and further questioning, she reiterated:

> T.W.  Like he grabbed me, like up here (indicating), and he like grabbed me by the arm and then like threw me against the locker. And then the bell had rung, people was coming out, and then I was just telling him like please let go of my arm, my arm is hurting. My arm cracked. I heard it pop.

R. 30-3 at 48; PageID # 603.

> Q.  . . . did you turn into Officer Morgan and chest bump him?
>
> T.W.  No, I didn't chest bump him or nothing.

R. 30-3 at 48-49; PageID # 603-04.

8

Q.      . . . when Officer Morgan had you, I'll say restrained up against the lockers, did you say anything to Officer Morgan at that point?

T.W.    No, I was just like can you let go of my arm, my arm hurts. He still having it. He said when I heard you was here I told you I was going to jack your ass up.

Q.      Again, are those the exact words you remember him saying?

T.W.    He whispered in, I told you I was going to jack your ass up.

Q.      Did you say anything in response to that?

T.W.    I was just like, can you let go of my arm? My arm aching, like it hurt.

R. 30-3 at 50; PageID # 605. To summarize, according to T.W., as she was innocuously making her way back to the principal's office, as instructed, Officer Morgan needlessly confronted her and, even though she offered no resistance, was not fleeing, and posed no threat to anyone at that point, he grabbed her physically, slammed her into the lockers, and broke her arm. Furthermore, as she pled for relief due to the pain in her arm, Officer Morgan continued the pressure on her arm and whispered menacing comments into her ear. All this, she claims, was excessive.

The district court, properly considering the evidence in the light most favorable to T.W., drew certain inferences in reaching its conclusion that genuine disputes of material fact warranted consideration and determination by a jury. These were inferences such as: on whole, this was merely an unruly student in a school setting (a commonplace occurrence that teachers handle routinely, without the use of any force); at this moment, T.W. posed no safety threat to Officer Morgan or any other students; and Officer Morgan did more than just restrain T.W. with an "arm-bar," he forced her up against the lockers to add to the force and used his "massive" size advantage to physically lift her off the ground by the arm, which apparently broke her arm. The district court also recognized that Officer Morgan refused to let her go, despite her pleading, and instead escorted her using that continued pressure, which a jury could deem gratuitous.

Officer Morgan would have us reject T.W.'s evidence and the district court's inferences and undertake a plenary review of the record, using his preferred view of the facts. According to

Officer Morgan's version of events, his intervention with T.W. was necessary, proper, and justified.  In his brief, he offers five factual allegations in support of this argument:

(1) "the teachers and administrators had attempted to 'handle' the situation prior to Officer Morgan's involvement, and their efforts seemingly failed";

(2) "T.W. had truly committed criminal offenses (criminal damaging and disorderly conduct)";

(3) "T.W. displayed no signs of calming her defiant and aggressive behavior";

(4) "use of a control hold on an aggressive person, who breaches the officer's reactionary gap, is proper" and "immobilizing the aggressor against a stationary object [such as the hallway lockers] for stabilization purposes, is also proper"; and

(5) "There is no direct evidence that T.W. did not pose a threat to other students with her defiant and hostile behavior."

Apt. Br. at 19-21.  More to the point, Officer Morgan insists that the district court misconstrued the evidence and erred by drawing the opposite inference on each of these assertions.

While we are certainly skeptical about the truth of Officer Morgan's assertions, our assessment of the evidence at this point is irrelevant.  Simply put, this is exactly the type of factual dispute for which we have no interlocutory appellate jurisdiction.  *See*, *e.g.*, *Ortiz*, 562 U.S. at 190; *Johnson*, 515 U.S. at 307; *Romo*, 723 F.3d at 673-74; *DiLuzio*, 796 F.3d at 611.

**2.**

Alternatively, Officer Morgan argues that the district court misconstrued the events depicted in the video, such that its determination was "blatantly contradicted by the record, so that no reasonable jury could believe it," *see Scott*, 550 U.S. at 380.  As we have explained, whether the district court properly assessed incontrovertible record evidence is a legal challenge over which we have appellate jurisdiction on interlocutory appeal.  *Plumhoff*, 134 S. Ct. at 2019.

In his appellate brief, Officer Morgan makes five specific factual allegations, based on his interpretation of the video recording, which he offers as support for this argument:

(1)    "the video depicts T.W. ratcheting up her defiant behavior by grabbing at Officer Morgan and completely disregarding Officer Morgan's authoritative posture";

(2)    "the video depicts T.W. well within Officer Morgan's reactionary gap and grabbing at his arm";

(3)    "the video clearly depicts T.W. as defiant and uncooperative to police authority, i.e., reaching toward Officer Morgan and kicking her feet";

(4)    "There is no reasonable dispute that T.W. was uncooperative based on the school surveillance video"; and

(5)    "the video clearly depicts T.W. displaying confrontational behavior."

Apt. Br. at 24-28 (emphases omitted). We described this video fully at the outset of this opinion. In the video, Officer Morgan is the clear aggressor; he pursues T.W. into the hallway, reaching for her neck or upper chest; when he catches her, he pushes her sharply against the lockers, physically turns her body towards the lockers, bends her left arm behind her back, and leans in close, apparently pressing his body against hers and speaking into her ear. He is significantly larger than T.W. and either lifts her or holds her off the floor by that arm, as both of her feet are off the floor while he holds her by the arm, which is bent severely behind her back. While T.W. does appear to squirm or writhe in response to the pressure on, and likely pain in, her arm, she does not necessarily appear defiant, uncooperative, or confrontational. She appears scared and wounded. Early in the video, as Officer Morgan attempts to grab her by the throat or upper chest, T.W. does attempt to fend off his hands as she retreats from him into the hallway, but such an instinctive defensive response does not, at least in this video, demonstrate a need for physical restraint. At no point does T.W. appear to be grabbing or kicking at Officer Morgan.

Given our review of the incontrovertible video recording evidence, we cannot say that the district court's determination or inferences were "blatantly contradicted by the record, so that no reasonable jury could believe it," *see Scott*, 550 U.S. at 380. Thus we reject this portion of the appeal and affirm the district court's determination. *See Plumhoff*, 134 S. Ct. at 2019.

**3.**

One final aspect of this factual dispute bears mention, as it is the predicate for Officer Morgan's principal theory of qualified immunity, which is that "Officer Morgan's control hold tactic is considered low level force . . . consistent with the defensive tactics training of the Akron Police Department," Apt. Br. at 8 (citations omitted), and "[a] single, brief and limited act of placing T.W., an uncooperative minor, against the lockers (or any stationary object) for control purposes does not rise to the level of an unreasonable use of force," Apt. Br. at 25. That being a true statement, standing on its own, we are compelled to point out two qualifiers.

First, the mere fact that this particular hold, when executed properly, is considered low-level force and is a recommended tactic, is meaningless in a circumstance of misuse or misapplication, as is alleged here. For example, a handshake, in and of itself, can hardly be considered force at all, let alone excessive force; but if the larger, stronger participant were to squeeze so hard or twist so far as to break the other's bones, we would not hold as a matter of law that the force was not excessive just because the interaction was "merely a handshake." Nor could we reasonably conclude that the prohibition against such bone-crushing force was not clearly established because the case law is devoid of cases specifically forbidding handshakes. *See*, *e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). This argument, premised as it is on faulty or omitted facts, is as irrelevant as it is misguided.

And that leads to the second qualifier: this argument relies entirely on facts that contradict the plaintiff's proffered evidence, the incontrovertible video recording, and the district court's determinations and inferences. Consequently, we must reject or ignore this argument.

12

**C.**

Officer Morgan next argues that, when considered in light of the proper facts and inferences, the force he used was not excessive. And, as explained, we may discard the appellant's fact-based or "evidence sufficiency" challenges and exercise the jurisdiction we do have to reconsider the district court's legal determinations, based on the plaintiffs' version of the facts and the inferences as articulated by the district court. *See DiLuzio*, 796 F.3d at 610.

"It is axiomatic that individuals have a constitutional right not to be subjected to excessive force during . . . [a police] 'seizure' of his [or her] person." *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009); *Graham v. Connor*, 490 U.S. 386, 388 (1989). In measuring "excessiveness," we ask whether the officer's conduct was "objectively reasonable" under the circumstances, considering the severity of the underlying crime, whether the suspect posed an immediate threat to the safety of the officers or others, or whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.*

Here, according to T.W.'s version of the evidence, the irrefutable video recording evidence, and the district court's findings and inferences, Officer Morgan needlessly instigated an altercation with this 13-year old girl, first verbally and then physically. Using his size advantage and compliance-hold training, he aggressively pursued, seized, and manipulated her to the point that he broke her arm. He then maintained this physical restraint and pressure on her broken arm, despite her pleas for relief, all the while threatening or menacing her verbally.

The underlying "crime" in this case was that T.W. tore some paper posters off the school hallway wall, which the district court characterized as merely a temper tantrum or unruly student behavior. Despite Officer Morgan's contention that was a serious crime (criminal damaging and disorderly conduct), we are doubtful that a court would convict her of such charges, a prosecutor would pursue such charges, or a reasonable police officer would arrest her on such charges. In

fact, Officer Morgan did not actually arrest her here, nor did the Jennings CLC administration pursue any school discipline, let alone any criminal complaint.

Under these facts, a jury could conclude that Officer Morgan's conduct was not objectively reasonable and the force he used on T.W. was excessive, in violation of her constitutional right to be free of such force. His claim of qualified immunity must fail.

**D.**

Officer Morgan also argues that the prohibition against this force was not clearly established. That is, under the facts established for purposes of this appeal, Officer Morgan is contending that he had no forewarning that it would be improper for him to accost a 13-year old girl, without provocation or resistance, use his size advantage to place her physically against a wall; verbally menace or threaten her while he twisted her arm behind her back and lifted her off the floor until he broke that arm; and then maintain pressure on that broken arm, despite her pleas for relief, as he forced her down the hall to the principal's office with further verbal threats.

We disagree. This was clearly established. *See Norton v. Stille*, 526 F. App'x 509, 513-14 (6th Cir. 2013) (holding that the prohibition against gratuitous force was clearly established as of October 2010). But, even lacking a specific case on point, we conclude that this conduct, as alleged, was so gratuitous that Officer Morgan was nonetheless "on notice that [this] conduct violate[d] established law even in novel factual circumstances." *See Hope*, 536 U.S. at 741.

Officer Morgan is not entitled to qualified immunity on this basis.

**E.**

Finally, Officer Morgan argues that he is also entitled to qualified immunity under state law on the assault charge, for the same reasons that he is entitled to qualified immunity under federal law. Specifically, in his brief, he offers this pithy argument, without elaboration: "As

Officer Morgan is entitled to qualified immunity on Williams' excessive force claim, he is likewise entitled to qualified immunity on the assault claim under state law." Apt. Br. at 38.

Given our holding that Officer Morgan is not entitled to qualified immunity on the excessive force claim, this argument necessarily fails for lack of a valid premise. We reject this challenge and affirm the district court's judgment on this particular claim.

## III.

We AFFIRM the judgment of the district court denying qualified immunity.

**STRANCH, Circuit Judge,** concurring in the judgment. I agree with much of the reasoning and the outcome of the majority opinion. I write separately to address how we have jurisdiction over this case in light of the final judgment rule, reflected in 28 U.S.C. § 1291, and its function of protecting the role of trial courts and the efficiency of the appellate system. Specifically, my point concerns our jurisdiction over interlocutory appeals from denials of qualified immunity that involve factual disputes.

We have long recognized that we have jurisdiction to review neat legal questions on interlocutory appeal. In *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005), we explained that if "aside from [any] impermissible arguments regarding disputes of fact, [a] defendant [appealing a qualified immunity denial] also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which this court has jurisdiction." *Id.* (quoting *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998)). But there we also noted another limited area of jurisdiction. Relying on our precedent in two prior cases—*Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002), and *Beard v. Whitmore Lake School District*, 402 F.3d 598 (6th Cir. 2005)—*Estate of Carter* noted that "this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter*, 408 F.3d at 310 (citing *Phelps*, 286 F.3d at 298–99; *Beard*, 402 F.3d at 602 n.5). *Phelps* and *Beard* provide both the authority for and the parameters governing this proposition. *Phelps* explains that we have jurisdiction to disregard defendants' attempts to dispute plaintiffs' facts only in cases where "the legal issues are discrete from the factual disputes[.]" 286 F.3d at 298. *Beard* holds that interlocutory jurisdiction over appeals from denials of qualified immunity involving disputed facts only exists where "some minor factual issues are in dispute" and "it does not appear that the resolution of [such] factual issues is needed to resolve the legal issues"

16

also presented. 402 F.3d at 602 n.5; *see also Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001). If, on the other hand, disputed factual issues are "crucial to" a defendant's interlocutory qualified immunity appeal, we remain "obliged to dismiss it for lack of jurisdiction." *Phelps*, 286 F.3d at 298; *see also McKenna v. City of Royal Oak*, 469 F.3d 559, 561 (6th Cir. 2006). It is clear in the instant case that Officer Morgan disputes factual issues that are crucial to his interlocutory appeal, therefore we do not have jurisdiction over this case under the line of cases including *Phelps*, *Beard*, *Estate of Carter*, and *McKenna*.

There is another limited exception to the final judgment rule, however, that is present in this case. We have recognized that the Supreme Court's opinion in *Scott v. Harris*, 550 U.S. 372 (2007), created a narrow exception to the jurisdictional limitations on interlocutory appeals, allowing courts of appeal to assert interlocutory jurisdiction in qualified immunity appeals where a defendant claims that a "trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false[.]" *Moldowan v. City of Warren*, 578 F.3d 351, 370 (citation omitted). Because Officer Morgan has made such a claim here, I agree that this court has jurisdiction to hear his appeal, and I respectfully concur in the outcome reached by the majority.