[DO NOT PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-12330

_____

J.I.W.,
a minor, by and through T.W., his mother and next friend,

Plaintiff-Appellee,

versus

BLAKE DORMINEY,
individually,

Defendant-Appellant,

CITY OF SLOCOMB,
an Alabama municipality,

Defendant.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 1:20-cv-00787-ECM-KFP

————————————————

Before LUCK, BRASHER, and HULL, Circuit Judges.

PER CURIAM:

The question in this appeal is whether a school resource officer is entitled to qualified immunity for restraining a student, resulting in the officer breaking the student's arm. J.I.W., a thirteen-year-old middle school student at the time of the incident, had a history of psychological issues, having been hospitalized several times for psychological disorders. One afternoon, J.I.W. entered a classroom, informed his teacher he did not take his medication, and proceeded to act disruptively. The teacher instructed him to leave the classroom. J.I.W. moved into the hallway where the situation escalated, and J.I.W. refused to yield to educators' requests that he go to the principal's office. Two teachers, one guidance counselor, and one administrator tried to calm J.I.W. to no avail. J.I.W.'s behavior prompted an administrator to radio the school resource officer, Blake Dorminey, who arrived moments later.

Dorminey witnessed J.I.W. speaking with an administrator. J.I.W. then punched a locker and moved in the administrator's direction. Dorminey grabbed J.I.W. by the arm and attempted to

calm him down. Over the next thirty seconds, J.I.W. pulled away from Dorminey four times. Dorminey used three increasingly forceful "wristlock" maneuvers, each of which J.I.W. forcefully resisted. On the third try, J.I.W.'s arm "popped," and the two went to the ground. J.I.W. hit the ground and began writhing and screaming in pain. Dorminey applied handcuffs. After the incident, J.I.W. underwent two surgeries to repair his broken arm.

In this civil action, the district court denied Dorminey's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) holding that J.I.W. stated plausible claims for excessive force under 42 U.S.C. § 1983 and assault and battery under Alabama state law. The district court held that J.I.W. plausibly alleged Dorminey's use of force violated J.I.W.'s Fourth Amendment rights and the rights were clearly established. The district court denied Dorminey qualified immunity as to the excessive force claim and state agent immunity as to the Alabama-law assault and battery claims.

We disagree with the district court's denial of Dorminey's motion and hold that Dorminey is entitled to qualified immunity. Further, we hold that the dismissal of J.I.W.'s federal claim necessitates the dismissal of his state law claim on jurisdictional grounds and do not reach the question of whether he is entitled to state agent immunity. Accordingly, we reverse in part.

## I.    BACKGROUND

We derive the following facts from the operative complaint, witness statements that were incorporated into the complaint, and

a surveillance video relied on in the complaint. We construe all facts and draw all reasonable inferences in favor of the plaintiff.

J.I.W. was a thirteen-year-old middle school student at the time of the incident. He had a history of psychiatric issues. He had been hospitalized several times for psychological disorders, including bipolar disorder, obsessive compulsive disorder, oppositional defiant disorder, separation anxiety disorder, conduct disorder, ADHD, and major depression. These maladies interfered with J.I.W.'s ability to learn in a traditional school environment. Both the educators involved in the incident and Dorminey knew J.I.W. was prone to misbehavior.

The complaint and several witness statements, which the complaint incorporates by reference, reflect that J.I.W. "became agitated and upset" while in teacher Michelle Hendrix's classroom. J.I.W. entered the classroom and informed Hendrix that he had not taken his medication that day and she was "just going to have to deal with" his behavior. Further, J.I.W. would not allow Hendrix to begin class; he "continued to get up out of his desk, push his desk around, and sling his bookbag." J.I.W. became concerned that a group of students was talking about him. He "approached the group . . . and threatened" them to stop talking about him.

Hendrix became concerned "for the safety of the other students as well as for [J.I.W.'s] safety." She instructed J.I.W. to leave the classroom and go into the hallway. In the hallway, J.I.W. "became more agitated [and] angrier." Hendrix told J.I.W. to go see Assistant Principal Brad George, but J.I.W. refused and continued

to yell at her. Hendrix asked guidance counselor Kari Whitaker for help. Whitaker asked J.I.W. to walk with her to a place to calm down, but he refused. Whitaker recounted that J.I.W. "was acting very aggressive and disrespectful towards anyone who tried to reason with him."

More educators arrived. Assistant Principal George tried to calm J.I.W., but did not succeed. Special education teacher Staci Wilkerson also tried to deescalate the situation. She, too, failed. Wilkerson reported that J.I.W. exhibited "signs of anger."

After multiple educators failed to get J.I.W. under control, George radioed Dorminey. Dorminey received the call "to respond to the . . . School," but George gave no other information. B.T. Hinson, a principal at the adjoining high school, heard the call for a school resource officer and came to the middle school. He arrived before Dorminey and "tried to get [J.I.W.] to talk" and "go for a walk to calm down." J.I.W. "yelled at [Hinson] and wouldn't go." Principal Zeb Brown also arrived around this time. As Brown approached, he saw that Hinson "was engaged with the student."

Dorminey entered the school and followed the sound of "shouting and screaming" to the hallway. He then noticed that J.I.W., a student he "had dealings with in the past," was speaking with Hinson. J.I.W. "punched a metal locker" and proceeded to move in the direction of Hinson.

All but one witness reported that J.I.W. moved aggressively or threateningly. Whitaker reported that J.I.W. "punched the

locker and bowed up at [Hinson] acting like he was going to hit him." George recalled that J.I.W. "turned and punched a locker[] and then 'bowed' up at [Hinson]." Wilkerson reported that J.I.W. "punched the locker and c[ame] at [Hinson]." Hinson remembered that "[a]fter punching the locker, [J.I.W.] started walking toward me aggressively." Brown said that while Hinson and J.I.W. were talking, J.I.W. "suddenly turned" away from Hinson "and punched [a] locker," then "turned back towards [Hinson] with his shoulders back, fist clenched[,] and chest out lunging in the direction of [Hinson]." For his part, Dorminey remembered that J.I.W. "quickly turned towards Hinson with clinched closed fist[s] and lunged towards Hinson in a manner in which he was about to strike Hinson." Hendrix was alone in not referencing any aggression by J.I.W.

After J.I.W. moved toward Hinson, Dorminey "place[d] his left hand on J.I.W.'s left arm and beg[an] to walk him down [the] hallway." The video of the incident depicts Dorminey controlling J.I.W. by the left arm and directing him toward the left of the frame.

J.I.W. and Dorminey came to rest a few seconds later, with J.I.W. facing the wall. J.I.W. placed his free right hand on the wall and pushed back. Two seconds later, J.I.W. twisted his body to the left and away from Dorminey. Over the next five seconds, Dorminey tugged him back three times. Dorminey explained that, as he was holding J.I.W. by the arm, he told J.I.W. that if he did not "calm down," Dorminey "would have to place him in cuffs."

Dorminey spoke in a "calm but authoritative voice, as [he] kn[e]w in the past, loud and shouting [sic] does not calm [J.I.W.] down." Yet according to Dorminey, J.I.W. "rejected and refused" his commands and "actively resist[ed]" Dorminey through his movements. During the struggle, J.I.W. was "yell[ing]" at Dorminey, who was "instruct[ing] [J.I.W.] continuously to stop and stand still," or he would handcuff J.I.W. Hendrix stated that J.I.W. was yelling, "Leave me alone! Shut Up! Don't talk to me! I'm not going anywhere!"

Dorminey repositioned J.I.W. with his back to the wall, still guiding him by the left arm. Dorminey tugged J.I.W. back to him a fourth time. Dorminey "decided that verbal commands were not gaining control of the situation and decided to place [J.I.W.] in hand cuffs." "[W]ithout any visible provocation from J.I.W.," Dorminey "harshly twist[ed] J.I.W.'s wrist and wrenche[d] J.I.W.'s left arm behind his back." Dorminey bent J.I.W.'s left wrist up J.I.W.'s back and pushed his elbow crease toward the ground, but J.I.W. countered the force, backed into Dorminey, and bent over such that he stayed on his feet. Dorminey also "order[ed] [J.I.W.] to go to the ground."

The two stood back up, and Dorminey let go of J.I.W.'s wrist with his left hand, repositioned his hand further up J.I.W.'s arm, and pushed downward. J.I.W. had his backside against the wall and his legs planted, which allowed him to counter Dorminey's force again.

With J.I.W. still bent over from resisting the second takedown attempt, Dorminey pulled J.I.W.'s twisted left arm vertically and then forced it downward into J.I.W.'s back. Dorminey "slam[med] J.I.W. to the floor while simultaneously bringing his own body weight down on to J.I.W. and driving his elbow into J.I.W.'s back." He "heard a loud popping sound" as J.I.W. "began to go to the ground."

The video depicts the two coming to rest on the ground, with J.I.W. on his right side. Dorminey pulled back, and J.I.W. rolled onto his stomach and began frantically kicking his legs. J.I.W. began to "scream that []his arm was hurt and in pain." Dorminey, with J.I.W.'s left arm still bent and secured in Dorminey's left hand, placed his right hand in the small of J.I.W.'s back and straddled him. Dorminey secured handcuffs on J.I.W.'s left wrist while J.I.W. continued frantically kicking his legs. After a few seconds of additional kicking, Dorminey cuffed the right arm.

Dorminey let go of the left arm and kept J.I.W. handcuffed on his stomach while Dorminey used his radio for about a minute. Dorminey, now standing, set J.I.W. up by grabbing his right arm and shoulder. As Dorminey lifted the right side, J.I.W. slid his left leg under himself and sat on his backside. Dorminey let go of J.I.W., who moved back and leaned up against the wall. Dorminey removed the handcuffs a little over three minutes later. Paramedics arrived shortly after.

J.I.W. was taken to the hospital and diagnosed with a broken arm. His injuries required two surgeries. J.I.W. was not punished by the school or charged with a crime for his conduct.

J.I.W., by and through his mother, sued Dorminey and the City of Slocomb in the United States District Court for the Middle District of Alabama. He sought damages from Dorminey and the City under 42 U.S.C. § 1983 for excessive use of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution and from Dorminey for assault and battery under Alabama law.

Dorminey and the City moved to dismiss the complaint for failure to state a claim for relief. J.I.W. responded, conceding that he could neither recover from Dorminey in his official capacity nor recover punitive damages from the City. His response forfeited any independent claim against Dorminey under the Fourteenth Amendment, leaving only an excessive force claim. The district court also dismissed J.I.W.'s claim against the City. However, the district court denied Dorminey qualified and state agent immunity and thus his motion to dismiss as to the excessive force and Alabama law claims. Dorminey filed a timely notice of interlocutory appeal.

## II.    STANDARD OF REVIEW

We review a district court's ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) based on qualified immunity *de novo*, generally accepting the facts alleged in the

complaint as true and drawing all reasonable inferences from them in the plaintiff's favor. *See Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). A motion to dismiss is due to "be granted if the complaint fails to allege the violation of a clearly established constitutional right." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) (quotation omitted). When a government official raises the "defense of qualified immunity, we first consider whether the defendant government official has proved that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294–95 (11th Cir. 1998) (alteration and quotation omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

## III.    DISCUSSION

Dorminey argues that the district court erred in denying him (1) qualified immunity for the Section 1983 claim and (2) state agent immunity for the assault and battery claims.

### A.    *J.I.W.'s Section 1983 Claim*

We turn first to J.I.W.'s excessive force claim under Section 1983. Under the Fourth Amendment to the United States Constitution, a person has a right "to be secure" from all "unreasonable … seizures" of his person. U.S. Const. amend IV. J.I.W. does not challenge Dorminey's authority to detain him—he argues only the

force Dorminey used to bring about the detention was excessive. *See Richmond v. Badia*, 47 F.4th 1172, 1179–81 (11th Cir. 2022) (discussing the analytical difference between false arrest and excessive force claims). The right to be free from unreasonable seizures "includes the right to be free from the use of excessive force in the course of an arrest." *Saunders v. Duke*, 766 F.3d 1262, 1266–67 (11th Cir. 2014).

But under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a qualified immunity defense, the plaintiff must make two showings. *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 (11th Cir. 2022). First, "the plaintiff must establish that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). Second, "the plaintiff must show that the violation was clearly established." *Id.*

1. Whether *T.L.O.* Applies to an Excessive Force Claim Originating in a School Setting Is Immaterial.

Before addressing the facts of this case, we must determine whether to apply a standard for excessive force specific to schools. In excessive force cases, we typically determine whether a detainee's Fourth Amendment rights were violated by asking "whether the officer's conduct is objectively reasonable in light of

the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Under *Graham v. Connor*, the main question is whether "the force used by a police officer" is "reasonably proportionate to the need for that force." *Ferraro*, 284 F.3d at 1198 (applying *Graham v. Connor*, 490 U.S. 386 (1989)). But in the school setting, the Supreme Court recognized that the scrutiny applied to certain seizures is less demanding. In *New Jersey v. T.L.O.*, the Court held that "the legality of a *search* of a student should depend simply on the reasonableness, under all the circumstances, of the search." 469 U.S. 325, 341 (1985) (emphasis added).

As the Court explained in *T.L.O.*, the reasonableness of a search is a two-part inquiry: we must "first . . . consider whether the action was justified at its inception," and then ask "whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (cleaned up). In the search context, an initial search is justified when "reasonable grounds" suggest that a student violated "either the law or the rules of the school." *Id.* at 342. And at step two, a search is reasonable "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

We have applied *T.L.O.* to a student's unlawful detention claim against a school resource officer. In *Gray ex rel. Alexander v. Bostic*, we explained that this Court "appl[ies] the reasonableness standard articulated in [*T.L.O.*] to school *seizures* by law

enforcement officers." 458 F.3d 1295, 1304 (11th Cir. 2006) (emphasis added). But we did not reach the student's excessive force claim in *Gray*. *Id.* at 1304 n.6. And circuit courts of appeal do not expressly apply *T.L.O.* to excessive force claims. *Compare E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 179–85 (4th Cir. 2018) (evaluating a school resource officer's use of force to handcuff a student without citing *T.L.O.*), *and Hawker v. Sandy City Corp.*, 591 F. App'x 669, 674–76 (10th Cir. 2014) (evaluating an officer's use of a "twist-lock" against a student without citing *T.L.O.*), *with C.B. v. City of Sonora*, 769 F.3d 1005, 1030 (9th Cir. 2014) (holding that, under the circumstances, whether *T.L.O.* or *Graham* applied was "of little consequence").

We have never addressed whether *T.L.O* or the *Graham* standard applies to a school resource officer's use of force in school, and we need not do so here. *See Badia*, 47 F.4th at 1181 n.1 (declining to address whether *T.L.O.* or *Graham* controls the standard for determining the reasonableness of an initial detention in a school setting). Instead, we conclude that, here, whether *T.L.O.* or *Graham* applies "is of little consequence." *C.B.*, 769 F.3d at 1030. Indeed, there is not much daylight between asking whether Dorminey's conduct was "reasonably related in scope to the circumstances which justified the interference in the first place," *T.L.O.*, 469 U.S. at 341, and asking whether his use of force was "reasonably proportionate to the need for that force," *Lee*, 284 F.3d 1198. Both standards consider the initial justification for the force and measure the officer's actions against that need. Accordingly, we

adopt the two-part test promulgated by *T.L.O.*, with *Graham* guiding our analysis when necessary.

### 2. Dorminey's Use of Force Against J.I.W. Did Not Become So Unreasonable as to Violate Clearly Established Law.

Turning to the facts of this case, we cannot conclude that Dorminey's use of force violated J.I.W.'s clearly established constitutional rights. J.I.W. makes two arguments that "a reasonable officer" in Dorminey's position "would know that his conduct is unconstitutional under the Fourth Amendment." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017) (quotation omitted). First, he argues that relevant caselaw clearly established that Dorminey's conduct violated the constitution. Second, he argues that, even in the absence of relevant caselaw, it was "obviously clear" that Dorminey's conduct was unconstitutional. We disagree.

No one disputes that Dorminey's actions were justified when he first detained J.I.W. Indeed, all but one witness statement indicates that Dorminey witnessed J.I.W. move toward Hinson in an aggressive manner. *Id.* Because of this, the district court concluded that the initial seizure was justified, and J.I.W. does not challenge Dorminey's initial justification for the seizure on appeal. *Cf. Badia*, 47 F.4th at 1184 (where an initial use of force was unjustified when a student was not resisting, did not pose a threat, and there was no legitimate law enforcement justification for the force). Dorminey witnessed J.I.W. become aggressive, punch a locker, and turn toward Hinson in an aggressive manner. Further, the amount

of force used was reasonable. *See Saunders*, 766 F.3d at 1267. Dorminey merely grabbed J.I.W. by the arm, directed him away from Hinson, and held him there. We agree that this degree of force was justified.

As the matter escalated, Dorminey applied three additional types of force. First, he executed two "wristlocks" against J.I.W. and ordered him to the ground to handcuff him. Second, Dorminey physically forced J.I.W. to the ground using a more aggressive wristlock, which broke his arm. And third, he applied handcuffs. The district court suggested that Dorminey's actions became unreasonable at some point between the third wristlock and J.I.W. hitting the ground, and it permitted J.I.W.'s claims to proceed based on these actions. For his part, J.I.W. argues that the law is clearly established "that an unarmed arrestee who neither attempts to flee nor resists arrest cannot be subjected to force that causes severe physical injuries and emotional harm."

We cannot agree with the district court or J.I.W. because we believe the record establishes that J.I.W. was resisting. The complaint asserts that J.I.W. "never actually touched, or threatened to touch, any student, teacher, administrator, or defendant Dorminey in an offensive manner[,]" and "never attempt[ed] to . . . resist defendant Dorminey." But the witness statements, which were incorporated into the complaint without objection, describe J.I.W.'s actions toward the principal as "bow[ing] up," "com[ing] at him," walking aggressively toward him, or turning back toward him "with his shoulders back, fist clenched, and chest out lunging in the

direction of Mr. Hinson." Likewise, each witness statement describes J.I.W. resisting Dorminey in some capacity before Dorminey's escalated use of force. The video confirms the accuracy of the witness statements rather than the allegations in the complaint. J.I.W. has not argued that we cannot consider these statements or video and, in fact, relies on them himself.

Because J.I.W. was resisting, J.I.W. cannot point to a materially similar precedent nor establish that the violation was obvious enough to defeat Dorminey's qualified immunity defense. We have held that an officer violates a *non-resisting* detainee's rights by using force to apply handcuffs. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (a "gratuitous use of force when a criminal suspect is *not resisting* arrest constitutes excessive force") (emphasis added); *see also Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997) (affirming the denial of qualified immunity where an officer broke a plaintiff's arm by handcuffing him although the plaintiff was not resisting). But, when holding that force used to carry out handcuffing was excessive, we have expressly acknowledged the plaintiff's lack of resistance. *Smith*, 127 F.3d at 1419–20. For example, although the district court relied on *Smith* to deny qualified immunity, we emphasized in that decision that the detainee was "no[t] resis[ting] *at all.*" *Id.* at 1420.

J.I.W. also cannot establish that Dorminey's conduct was unlawful under the "obvious-clarity" test. To meet this standard, an officer's conduct must be so severe that every reasonable officer would have known the conduct was unlawful. *Gray*, 458 F.3d at

21-12330               Opinion of the Court                17

1307 (citing *Evans v. Stephens*, 407 F.3d 1272, 1283 (11th Cir. 2005) (en banc)). Our precedents do not indicate that handcuffing a resisting detainee is obviously unlawful. In fact, they establish the opposite. Handcuffing is a *de minimis* use of force. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) ("We have applied the de minimis force principle to handcuffing and granted officers qualified immunity in a series of cases."). This is because handcuffing "carries with it the right to use 'some degree of physical coercion or threat thereof,' and 'the typical arrest involves some force and injury.'" *Id.* (quoting *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002)). J.I.W. successfully resisted Dorminey's wristlock two times. In response, Dorminey applied more force until he overcame J.I.W.'s resistance. Not every reasonable officer in Dorminey's position would have believed that, in the face of such resistance, the force he used was unreasonable.

Our sister circuits' caselaw supports our conclusion. The Eighth Circuit held in *K.W.P. v. Kansas City Public Schools* that an officer did not violate a student's constitutional rights by handcuffing him. 931 F.3d 813, 826 (8th Cir. 2019). The reason: the student was resisting the officer and attempting to flee. *Id.* at 826–27. The court in *K.W.P.* cited an unpublished Tenth Circuit decision reaching the same result. *Id.* (citing *Hawker*, 591 F. App'x at 675). In *Hawker*, the Tenth Circuit held that an officer did not use excessive force when he applied a "twist-lock," which was meant to "painfully, but without intentional injury, distract the suspect from what he is doing (fighting or resisting)," to a resistant nine-year-old

suspected of theft. 591 F. App'x at 671 & n.1. The force was reasonable, even though it resulted in a "possible hairline fracture" of the child's collarbone, *id.* at 671, because the child was resisting the officer, *id.* at 675 ("[G]iven [the child's] resistance, [the officer's] actions in this case simply do not rise to the level of a constitutional violation.").

Where other circuits have held that handcuffing a student was excessive, it was because, unlike J.I.W., the student was not resisting. In *C.B.*, the Ninth Circuit held that an officer uses excessive force by placing "handcuffs on a calm, compliant, but nonresponsive 11–year–old child" with no justification other than "an assertion that they were told C.B. might run away." 769 F.3d at 1030. In *E.W.*, the Fourth Circuit held that handcuffing "a calm, compliant ten-year-old . . . on school grounds because she hit another student during a fight several days prior" was excessive. 884 F.3d at 180. And in *Williams v. Morgan*, the Sixth Circuit denied qualified immunity to an officer who "confronted" a thirteen-year-old student about an incident earlier in the day, orally threatened the student, "seize[d] her physically by pushing her up against the hallway lockers, bending her left arm behind her back, and eventually compell[ed] her submission via this restraint." 652 F. App'x 365, 367 (6th Cir. 2016). She was not resisting. *Id.* at 371. The Sixth Circuit determined that a jury could find that the force was excessive because it resulted in a broken arm and because the officer "maintained this physical restraint and pressure on her broken arm, despite her pleas for relief, all the while threatening or menacing her verbally." *Id.*

at 374. Accordingly, these decisions, and our own, counsel against us holding that the right here was clearly established.

The same can be said of Dorminey's action of forcibly taking the resisting J.I.W. to the ground. It was not clearly established at the time of the incident that taking a physically resistant middle schooler to the ground to carry out handcuffing was unconstitutional. To be sure, our decisions make clear that applying force to an already handcuffed and under control detainee can be excessive. It is excessive to "grab[]" a handcuffed arrestee "forcibly enough to bruise her arm and breast and then us[e] pepper spray" on the arrestee. *Vinyard*, 311 F.3d at 1349. It is excessive to "slam[] [an arrestee's] head against [a car] trunk *after* she was arrested and secured in handcuffs." *Lee*, 284 F.3d at 1198. And it is excessive to beat a handcuffed arrestee that is not resisting. *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000). But the line between reasonable and excessive force is marked by the resistance of the detainee and the potential threat posed to the arresting officers. For that reason, those authorities do not apply here. J.I.W. resisted Dorminey all the way to the ground.

## B.    *J.I.W.'s Alabama Assault and Battery Claims*

The district court declined to dismiss J.I.W.'s state law tort claims for assault and battery. It did so under the assumption that federal jurisdiction existed. However, the dismissal of J.I.W.'s excessive force claim eliminates any independent basis for federal jurisdiction. The sole remaining question on appeal is whether

Dorminey is entitled to state agent immunity against state law tort claims. "[T]he courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake" that inquiry. *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000). We conclude that the district court should dismiss J.I.W.'s state law tort claims so that he may pursue them, if at all, in state court.

## IV.    CONCLUSION

For these reasons, we **REVERSE IN PART** the district court's denial of Dorminey's Motion to Dismiss. We **REMAND** for further proceedings consistent with this opinion.

21-12330              BRASHER, J., Concurring                    1

BRASHER, Circuit Judge, Concurring:

I concur in the Court's opinion. I write separately to address a foundational issue that the parties did not raise, but that complicates our review: whether the district court correctly considered the witness statements and surveillance video in ruling on J.I.W.'s motion to dismiss.

Dorminey's arguments rely extensively on witness statements and the video, which he says J.I.W.'s complaint incorporates by reference as exhibits. Indeed, most of what we know about the incident between Dorminey and J.I.W. comes, not from the complaint, but from these extrinsic sources. Some parts of these witness statements and the video contradict the complaint's allegations. Other parts merely supplement those allegations.

The district court determined that it could consider the exhibits and video as they were incorporated by reference into the complaint. J.I.W. did not dispute that the statements and the video were incorporated into the complaint, nor did he argue that they should not supersede his more general allegations in the complaint. J.I.W. also does not challenge on appeal the district court's reliance on the exhibits. Further, J.I.W. relied on the exhibits extensively in his own brief on appeal.

I don't believe the doctrine of incorporation by reference is as simple as the parties believe it to be. For example, it appears we have never addressed, in a published precedential opinion, the question whether audiovisual evidence can be incorporated by

reference. *But see Quinette v. Reed*, 805 F. App'x 696, 700 (11th Cir. 2020) (nonprecedential opinion allowing incorporation of video evidence into complaint), cert. denied, 141 S. Ct. 2700 (2021). The source of our incorporation by reference jurisprudence is Federal Rule of Civil Procedure 10(c), and it states only that "[a] copy of a *written instrument* that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c)(emphasis added). Although there may be some other basis to incorporate a video into a complaint, a video is not a "written instrument." *See generally Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (allowing video evidence to be considered because, "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss"); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017)(same); Aimee Woodward Brown, *Pleading in Technicolor: When Can Litigants Incorporate Audiovisual Works into Their Complaints?*, 80 U. CHI. L. REV. 1269, 1276 (2013)(discussing grounds for considering video evidence on a motion to dismiss).

The unsworn witness statements present an even more serious problem. We have held that we may consider a document "beyond the face of the complaint" in ruling on a motion to dismiss, where the "plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Fin. Sec. Assur. Inc., v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). Under this rule, we have applied the doctrine of

incorporation by reference to various types of documentary evidence, including contracts, affidavits, and newspaper articles. *See, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020) (considering an affidavit incorporated when the plaintiff quoted from it in her complaint). But, applying this rule to this case, it is hard to see how any of these witness statements are central to the plaintiff's claims, given that they merely present the opposing party's view of the incident. And I am skeptical that the rules allow unsworn witness statements—which would not even be admissible at summary judgment—to contradict the allegations in a plaintiff's complaint about the events recounted therein.

Nonetheless, despite my skepticism, I agree with the Court's opinion because both parties have asked us to consider these documents and the video. Indeed, J.I.W.'s brief quotes extensively from Dorminey's unsworn witness statement as if we should consider it, not J.I.W.'s complaint, as the operative pleading. Accordingly, this issue has been roundly and intentionally forfeited. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012); *Fed. Sav. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 373 n.3 (11th Cir. 1987).